# UNITED STATES DISTRICT COURT
# SOUTHERN DISTRICT OF OHIO
# WESTERN DIVISION

CP-1005 GILBERT AVENUE, LLC,

    Plaintiff,

    v.

GREYHOUND LINES, INC., *et al.*,

    Defendants.

Case No. 1:23-cv-727

JUDGE DOUGLAS R. COLE

## OPINION AND ORDER

Defendant Greyhound Lines, Inc., (Greyhound) wants out of this breach-of-contract action, and it wants out now. It has moved to substitute FirstGroup Services, Inc., (FGS) in its place as the defendant under Federal Rules of Civil Procedure 17 and 25(c). (Doc. 19). That is proper, so Greyhound says, because FGS has purportedly been assigned all Greyhound's interests in and has assumed all Greyhound's obligations under "the" contract Greyhound says is at issue here. (*Id.* at #78). Greyhound's counsel, who also represents FGS, informs the Court that FGS consents to the substitution. (*Id.* at #73). Plaintiff CP-1005 Gilbert Avenue, LLC, (CP-1005), for its part, objects to a straight-line substitution but does not oppose FGS's joinder as a defendant. (*Id.*; *see* Doc. 21). As explained further below, the Court concludes it is premature for Greyhound to grab a bus out of town, principally because this case involves two contracts, not one, and Greyhound's assignment of one of those contracts does nothing to address its potential liability on the other. Accordingly, the Court **DENIES** Greyhound's Motion to Substitute. (Doc. 19).

## BACKGROUND

According to the Complaint, on September 28, 2021, Greyhound executed a Purchase and Sale Agreement (PSA)[1] with Chavez Properties Acquisition, LLC, the predecessor in interest to CP-1005, to sell real estate located at 1005 Gilbert Avenue in downtown Cincinnati. (Doc. 1 ¶¶ 6–8, #2–3). The PSA obligated Greyhound to remove underground diesel storage tanks at the Gilbert Avenue location and to obtain a clean bill of health from two state environmental agencies within twenty-four months of the closing date. (*Id.* ¶ 9, #3). To facilitate removal, the PSA included a holdback provision, which "allows the buyer [(here, Chavez Properties Acquisition, LLC)] to retain part of the purchase price for some time after closing to allow it to test whether the seller's [(here, Greyhound)] warranties were accurate," such as its compliance with certain enumerated environmental obligations. *SAT Tech., Inc. v. CECO Envt'l Corp.*, No. 1:18-cv-907, 2023 WL 6119934, at *1 (S.D. Ohio Sept. 19, 2023). The PSA's holdback provision permitted $600,000 of the purchase price to be held in escrow: up to $200,000 of which could be disbursed to Greyhound to cover tank removal costs; with the remaining $400,000 (plus any portion of the $200,000 not already disbursed) to be disbursed to Greyhound upon successful completion of the tank removal process. (Doc. 1 ¶ 10, #3; Doc. 24, #269–71).

---

[1] The original PSA was executed on June 3, 2021. (Doc. 1 ¶ 6, #2). For whatever reason, Chavez Properties Acquisition, LLC, terminated the agreement, and then executed a document reinstating the agreement subject to several amendments on September 28, 2021. (*Id.* ¶¶ 7–8, #2–3). Because it does not affect the Court's analysis and for sake of the reader, the Court will refer collectively to this reinstated and amended agreement as the PSA.

On September 30, 2021, Chavez Properties Acquisition, LLC, formally assigned all its rights and obligations under the PSA to CP-1005. (Doc. 1, ¶ 11, #3). The sale of the property closed on October 5, 2021, (*id.* ¶ 12, #3), and the parties executed a second contract, the Escrow Agreement, to govern the $600,000 holdback value. That agreement established an escrow account managed by former Defendant Chicago Title Insurance Company (Chicago Title). (*Id.* ¶¶ 13–14, #3–4; Doc. 24, #292–95).

In August 2022, Chicago Title disbursed $200,000 to Greyhound under the PSA and the Escrow Agreement as part of the tank removal process. (Doc. 1 ¶ 14, #4). Greyhound allegedly requested another disbursement on September 18, 2023. (*Id.* ¶ 15, #4). CP-1005 objected because Greyhound had not established its compliance with the tank removal requirements under the PSA and the Escrow Agreement, which CP-1005 alleges was necessary for Chicago Title to disburse any holdback value above the first $200,000. (*Id.*). On the second-year anniversary of the closing date, October 5, 2023, CP-1005 alleges Greyhound failed to complete the tank removal process. (*Id.* ¶ 16, #4). Although CP-1005 believes Greyhound's failure automatically entitled CP-1005 to receive the balance of the holdback value under the Escrow Agreement, Greyhound allegedly objected to any disbursement. Given the dispute, Chicago Title refused to release the escrow funds. (*Id.* ¶¶ 16–18, #4).

So, invoking the Court's diversity jurisdiction, CP-1005 sued Greyhound on November 7, 2023. It claims Greyhound's failure to complete the tank removal process breached the PSA and thereby damaged CP-1005 because it cannot develop

3

and sell the property. (*Id.* ¶¶ 19–22, #5). And it claims Greyhound's objection to delivery of the funds to CP-1005 breached the Escrow Agreement. (*Id.* ¶¶ 23–25, #5). Finally, CP-1005 seeks a judgment declaring its entitlement (whether under the PSA, the Escrow Agreement, or both) to the remaining $400,000 holdback value held in escrow. (*Id.* ¶¶ 26–32, #6). Based on these three claims, CP-1005 demands compensatory damages, pre- and post-judgment interest, and fees and costs beyond the declaratory judgment (and thus also beyond the remaining amount held in escrow). (*Id.* at #6).

Because this lawsuit requires, in part, adjudication of CP-1005's and Greyhound's respective interests in the escrow funds, CP-1005 also interpleaded Chicago Title as a defendant. (*Id.* ¶¶ 3, 31, #1–2, 6). On December 6, 2023, Chicago Title moved (unopposed) to deposit the disputed funds with the Court and to be dismissed from the cause. (Doc. 11, #34). After the Court granted the motion, Chicago Title deposited $400,314.03 (the holdback value plus interest sans Chicago Title's costs) with the Court, and the Court dismissed Chicago Title from the action with prejudice. (Docs. 15, 16).

Greyhound then answered. (Doc. 17). About a month later, on January 18, 2024, Greyhound moved under Federal Rules of Civil Procedure 17 and 25(c) to substitute FGS as the defendant here. (Doc. 19, #73). Greyhound claims that FGS has been assigned its interests in the escrow fund and has assumed all of its

4

obligations under the Escrow Agreement,[2] which means Greyhound has no more stake in this suit. (*Id.* at #75–77). CP-1005 objects to substitution arguing that Greyhound may have continuing obligations under the Escrow Agreement and that this lawsuit also claims that Greyhound breached the PSA, both of which mean Greyhound is still a proper defendant. (Doc. 21, #95–96). But CP-1005 makes clear it "would not object should [FGS] move to intervene as a party in this action to assert whatever claim it believes it has to the funds Chicago Title paid into Court." (*Id.* at #99). Greyhound replied[3]—focusing exclusively on substituting FGS under Rule 25(c). (Doc. 25, #301–02). So the matter is now ripe for the Court's review.

## LAW AND ANALYSIS

**A.    Rule 25(c)**

Under Rule 25(c), "[i]f an interest is transferred, the action may be continued by or against the original party unless the court, on motion, orders the transferee to be substituted in the action or joined with the original party." Fed. R. Civ. P. 25(c). "It provides a procedural tool and does not typically impact the parties' substantive

---

[2] Technically, Greyhound first executed an agreement on October 21, 2021, that entitled an entity named FirstGroup, PLC, to be paid the remaining $400,000 of holdback value upon completion of the tank removal work. (Doc. 19, #75–76; Doc. 19-1, #80). Then, after the filing of this suit, on December 1, 2023, Greyhound executed an agreement assigning all interests under the Escrow Agreement to FirstGroup, PLC, in which agreement FirstGroup, PLC, also agreed to assume Greyhound's obligations under the Escrow Agreement. (Doc. 19-1, #80–82). Three days later, on December 4, 2023, FirstGroup, PLC, assigned its rights to FGS, who also agreed to assume the Escrow Agreement obligations of FirstGroup, PLC. (Doc. 19-2, #85, 87).

[3] As FGS's addition or substitution for Greyhound may affect the Court's diversity jurisdiction under 28 U.S.C. § 1332(a), Greyhound also filed a citizenship disclosure statement for FGS, as is required by Federal Rule of Civil Procedure 7.1(a)(2). (Doc. 26, #313). As the statement makes clear, the substitution or joinder of FGS, which is incorporated in Delaware and has its principal place of business in Scotland, would not divest the Court of jurisdiction, as the parties would still be completely diverse. (Doc. 1 ¶¶ 1–2, #1; Doc. 26, #313).

rights." *United States ex rel. Kramer v. Doyle*, No. 1:18-cv-373, 2023 WL 4072123, at *1 (S.D. Ohio June 20, 2023). "The Rule turns on the transferor having transferred away, at least to some extent, a relevant litigation interest." *Id.* And "[a]s Rule 25(c) is only procedural, the Court must [] locate the substantive law that governs whether an entity has indeed transferred a litigation interest." *Id.* at *2.

Although this motion was filed at the pleading stage, caselaw suggests the Court may review evidentiary materials outside the pleadings and, as necessary, hold an evidentiary hearing to ascertain whether substitution is warranted. *Roxane Lab'ys, Inc. v. Abbott Lab'ys*, No. 2:12-cv-312, 2012 WL 5511138, at *2 (S.D. Ohio Nov. 14, 2012) (reviewing exhibits attached to the Rule 25(c) motion filed at the pleading stage); *see Sullivan v. Running Waters Irrigation, Inc.*, 739 F.3d 354, 359 (7th Cir. 2014) (explaining that whether to hold an evidentiary hearing to resolve a Rule 25(c) motion is committed to the sound discretion of the court and is not necessary if the party opposing substitution "cannot show than an evidentiary hearing would have an articulable bearing on the material issues in dispute" and "briefing … [is] []sufficient to present or [to] rebut material facts"); *cf. Luxliner P.L. Export, Co. v. RDI/Luxliner, Inc.*, 13 F.3d 69, 72–73 (3d Cir. 1993) (noting that Rule 25(c) does not contain an evidentiary standard and concluding that the district court should apply a summary judgment standard to the evidence presented—evaluating whether there is a genuine issue of material fact that substitution is warranted as a matter of law or whether an evidentiary hearing is needed to weigh the probative value of competing affidavits);

6

*cf. also United States v. Harold*, 423 F. Supp. 3d 410, 414 (E.D. Mich. 2019).[4] Even so, "[b]ecause Rule 25(c) is merely a procedural device designed to facilitate the conduct of a case, a decision under the Rule generally falls within the district court's discretion." *Roxane*, 2012 WL 5511138, at *2.

Greyhound wants an early exit under Rule 25(c). According to Greyhound, it no longer retains any interest in this cause because (1) the suit is concerned only with who owns the escrow funds (now deposited with the Court), and (2) it has wholly assigned its interests in those funds and its related obligations under the Escrow Agreement to FGS.[5] (Doc. 19, #77–78).

But the Court struggles to square Greyhound's argument with the allegations in the Complaint. A plain reading of the latter suggests that this case is not solely about the escrow funds or the Escrow Agreement. Sure, two counts of the Complaint focus specifically on the parties' dispute over who owns the remaining escrow funds. (Doc. 1, #5–6). But there is a third count. That count, Count I, expressly alleges that "[b]y failing, to deliver evidence of [a passing inspection from the state environmental

---

[4] Admittedly, *Luxliner* and *Harold* crafted an evidentiary standard tailored to ameliorating due process concerns that arise from substituting a party at the end of a suit when it would bind him to an established judgment. *Luxliner*, 13 F.3d at 72 (recognizing the summary judgment standard is needed given "a decision on a Rule 25(c) motion [at that stage of the suit] effectively imposes liability" on the substituted party); *accord Harold*, 423 F. Supp. 3d at 414. But they are still persuasive authority for the propriety of the Court's review of the evidentiary record proffered in connection with a motion to substitute so the Court may resolve that dispute.

[5] CP-1005 implies it needed to consent for Greyhound successfully to assign its obligations under the Escrow Agreement to FGS. (Doc. 21, #100). But the Escrow Agreement seems to contemplate otherwise—one of the provisions states that the Escrow Agreement "shall inure to the benefit of and shall bind Seller, Purchaser, and Escrow Agent, and *each of their respective successors or assigns*." (Doc. 24, #295 (emphasis added)).

7

agencies about the tank removal] … within two years of the closing, Greyhound has breached its obligations *under the [PSA].*" (*Id.* ¶ 20, #5 (emphasis added)). And for that blown deadline, CP-1005 alleges it has suffered damages occasioned by its inability to "develop the property or [to] sell the property for development while an environmental cloud remains." (*Id.* ¶ 21, #5). Moreover, CP-1005 says those damages are *in addition to* the "*further* damages" resulting from "Greyhound's refusal to allow disbursement of the escrow funds." (*Id.* ¶¶ 21–22, #5 (emphasis added)). That seemingly alleges that Greyhound is liable for a breach of, and the damages unique to, the alleged violation of the PSA, not just the Escrow Agreement. And independent of whether FGS's assumption of Greyhound's obligations under the Escrow Agreement wholly relieves Greyhound of all liability to CP-1005 under that agreement (a question the Court does not resolve here), that would not somehow terminate Greyhound's liability under the PSA—a distinct, but related, contract. So Greyhound is still a proper defendant with respect to Count I, the PSA-related count, of the Complaint.

Greyhound resists this conclusion by arguing that the contract provisions at issue, at least as they relate to the underground tank removal process and the timing of the release of the escrow funds, are in both the PSA and the Escrow Agreement and are materially similar. (Doc. 25, #300–01). And from this, Greyhound speculates that "the Court need not look further than the Escrow Agreement to make its decision … in this matter, as that is the document that was intended to govern this dispute." (*Id.* at #301). After all, Greyhound proclaims, "this dispute [is] over who is

8

entitled to receipt of the escrowed funds" and "[t]o hold otherwise would render the Escrow Agreement completely useless." (*Id.*). Again, the Court finds it disagrees.

To start, as pointed out above, CP-1005 alleged in its Complaint that it suffered damages (beyond being deprived of the escrow funds) due to Greyhound's failure to meet the PSA's tank-removal deadlines. (Doc. 1 ¶ 21, #5). And, unsurprisingly, that delay harmed CP-1005 *under the PSA* as it "impaired" "the development potential of the property"—property conveyed by *the PSA*, not the Escrow Agreement—for the time the "environmental cloud remain[ed]" over the property. (*Id.*). These allegations contemplate that CP-1005, if meritorious, will recover compensatory damages under the PSA that are unique to a breach of the PSA and that constitute more than the value of the withheld escrow funds. In other words, Count I of the Complaint alleges a theory of liability specifically arising under the PSA. And as Greyhound's assignment does not alter its PSA-related obligations, (Doc. 19-1, #82 (assigning only the Escrow Agreement)), Greyhound is still accountable for Count I of the Complaint.

Moreover (and contrary to Greyhound's suggestion), even were the parallel tank-removal provisions in the PSA and the Escrow Agreement identical, (Doc. 25, #300–01 (stating only that the contracts contain provisions governing the escrow funds that are "consistent")), treating Greyhound's alleged non-performance of its tank-removal obligations as a breach of both contracts does not "render the Escrow Agreement completely useless." (*Id.* at #301). As against the PSA, which concerns just the buyer and seller, the Escrow Agreement plays the unique role of defining the tripartite relationship of the buyer, seller, and a third-party escrow agent, the latter

9

of whom is foreign to the PSA. (Doc. 24, #293 ("Escrow Agent is not a party to, or bound by any other agreement between Seller and Purchaser which may relate to this [Escrow] Agreement.")). This separation makes good sense. A neutral third party, who is to serve as the appointed escrow agent, certainly would be loath to sign an actual purchase agreement—if it did, it would risk unnecessary entanglement in a buyer-seller spat should things sour. Nor is this mere speculation as evidenced by Chicago Title's desire to wash its hands of this dispute by moving to deposit the escrow funds with the Court and to be dismissed from the case. (Doc. 11). Accordingly, the PSA and the Escrow Agreement are naturally distinct contracts that implicate distinct legal rights and obligations, even if they are intertwined and work in tandem.

By implication, that means there is nothing untoward about holding that the Complaint may justifiably raise discrete claims under both the PSA and the Escrow Agreement for the same failure to perform—that is to say, Greyhound's alleged non-performance of its tank-removal obligations may validly constitute a breach of the tank removal-provisions in the PSA as well as a breach of the parallel provisions found in the Escrow Agreement. The rights CP-1005 has under the PSA and the Escrow Agreement are distinct and therefore give rise to distinct legal claims. CP-1005 may vindicate those distinct rights by raising a separate breach-of-contract claim for each agreement. FGS's assumption of Greyhound's rights and liabilities under the Escrow Agreement thus does not foreclose Greyhound's separate-but-related liability to CP-1005 for its alleged breach of the PSA.

10

Perhaps, Greyhound is instead suggesting that the funds held under the Escrow Agreement somehow represent a cap on the damages CP-1005 can recover under the PSA for Greyhound's breach of the tank-removal provisions under that contract. If that were so, Greyhound's request for an early exit may make sense. If the only dispute were where the remaining escrow funds go, then the Court agrees Greyhound would have no interest. But that argument seems to fly in the face of the PSA's language. Section 14.1 of the PSA provides the remedies available to the purchaser under that contract in the event Greyhound breaches. (Doc. 24, #222). True, that provision places a ceiling on remedies available to the buyer in the event Greyhound backed out of the agreement *before* closing—CP-1005 was permitted to seek specific performance or have its contribution to the escrow account (a $100,000 earnest money payment) returned. (*Id.* at #202, 204–05, 222, 272). But the PSA then goes on to suggest that "nothing contained in this Section 14.1 limits [Greyhound's] liability for a default in the performance of any representations, covenants, indemnities or obligations that survive the Closing or the termination of this Agreement." (*Id.* at #222). Admittedly, another section, Section 11.3 of the PSA, also appears to contemplate a monetary cap on damages applicable to breaches of certain representations and warranties—and possibly to breaches of all other provisions of the PSA. (*See id.* at #215 ("Purchaser agrees that any liability of Seller … [for] any breach will be limited to the lesser of" $75,000 or compensatory damages)). But

11

without opining on the provision's meaning and enforceability,[6] it is clear the cap under this section is not based on, or otherwise tied to, the funds held in escrow. So, even assuming (without deciding) CP-1005's damages for a breach of the tank-removal provisions are subject to the cap set forth in Section 11.3, Greyhound's obligation to compensate CP-1005 for that breach runs independent of which party holds Greyhound's interest in the Escrow Agreement and related funds. And apart from that Section 11.3 issue, nothing else in the PSA, and certainly nothing in the PSA provisions relating to the tank-removal process, suggests that CP-1005's only relief in the event Greyhound fails to perform its tank-removal obligations would be limited to the remaining escrow funds. (*See id.* at #220–22, 269–72). To the contrary, CP-1005 notes, for example, that Greyhound may be responsible under the PSA for CP-1005's attorneys' fees arising from this suit. (Doc. 21, #99 (citing Doc. 24, #225 (Section 15.9))).

Nor is it any answer to this problem to say that FGS would be willing to foot the bill if Greyhound is found to owe under the PSA. (Doc. 25, #301). Whatever the private arrangement between Greyhound and FGS about the latter covering the former's PSA-based liabilities, that is not the equivalent of FGS's actually assuming Greyhound's obligations under that contract. (Nor does it address whether any such assumption may be subject to approval by the PSA counterparty.) And absent a valid

---

[6] Notably, Section 11.3 references a "representation and warranty set forth in Section 11.1(j)," (Doc. 24, #215), but the Court is not clear to what that clause refers as it has not found any such provision labeled "11.1(j)" in the copies of the agreements provided to the Court.

assumption, Greyhound is still responsible to CP-1005 as the defendant under the PSA-related claim in the Complaint.

Simply put, Greyhound, and only Greyhound, may be answerable for Count I of the Complaint—the PSA-related breach-of-contract claim. And so long as Greyhound is the proper defendant for at least one claim raised in the Complaint, it may not extricate itself from this suit under Rule 25(c).[7]

## B. Greyhound's Rule 17 Argument

Relying on the same argument it proffered under Rule 25(c), Greyhound also initially argued that substitution of FGS is proper under Rule 17 as the claimed real party in interest. (Doc. 19, #77–78). Rule 17 requires "[a]n action [] be prosecuted in the name of the real party in interest." Fed. R. Civ. P. 17(a)(1). And it provides that "[t]he court may not dismiss an action for failure to prosecute in the name of the real party in interest until, after an objection, a reasonable time has been allowed for the real party in interest to ratify, [to] join, or [to] be substituted in the action." Fed. R.

---

[7] Because the fact that Greyhound may still be liable under the PSA resolves whether it is entitled to exit this suit stage left, the Court does not reach and thus does not opine on whether Greyhound remains liable under the Escrow Agreement even after FGS has been assigned its rights and has assumed its obligations. (Doc. 21, #99–100 (citing Ohio law to argue that an assignor remains liable as a surety even after assignment); *see* Doc. 25, #302 (assuming CP-1005's secondary liability assertion is correct)). But the Court notes in passing that the parties contracted to have the Escrow Agreement governed by Texas law. (Doc. 24, #295). Under Ohio conflict-of-law rules, which governs this diversity action, *Shanghai Weston Trading Co. v. Tedia Co.*, No. 1:23-cv-117, 2023 WL 8787235, at *3 n.5 (S.D. Ohio Dec. 19, 2023), their choice of law is presumptively valid, *Allstate Fire & Cas. Ins. Co. v. Moore*, 993 N.E.2d 429, 434 (Ohio Ct. App. 2013). So, without "delving too deeply" into the issue, as no party raised it, *Shanghai Weston*, 2023 WL 8787235, at *3 n.5 (cleaned up), the Court notes that, on first blush, any argument about the viability of and obligations stemming from Greyhound's assignment seemingly would need to have a basis in Texas law, *cf. Kramer*, 2023 WL 4072123, at *2 (explaining that the transfer of a party's obligations under a contract is governed by the applicable substantive law). Of course, this suggestion about Texas law is subject to revision and reconsideration should the parties choose to raise it at a later date.

Civ. P. 17(a)(3). Greyhound, however, abandoned this argument in its reply, (*see* Doc. 25), which means the Court need not consider it. *Wigington v. Metro. Nashville Airport Auth.*, 374 F. Supp. 3d 681, 686 n.2 (M.D. Tenn. 2019). But even assuming the issue is still before the Court, Rule 17 is of no help to Greyhound as a means of escape from this suit. As explained above, *see supra* Part A, Greyhound is still on the hook for Count I of the Complaint, which means Greyhound, not FGS, is necessarily the real party in interest responsible for defending against, at the very least, that claim.

That said, even though Greyhound will remain, the assignments attached to its motion, (Doc. 19-1, #82; Doc 19-2, #87), do raise the specter that FGS is the real party in interest under the Escrow Agreement.[8] And at the very least, the assignments suggest that FGS should be provided the opportunity to join the shindig—either by joinder, intervention, or ratification, as FGS sees fit. Simply, given not even CP-1005 objects to FGS's addition to the cast of characters, (Doc. 21, #99), and considering the assignment agreements appear to grant FGS a valid stake in this litigation, the Court would entertain a motion from FGS to become a party to this suit, should it so move.[9]

---

[8] The Court should not be understood to have conclusively determined that FGS is, in fact, the real party in interest on that agreement. The Court has not fully resolved CP-1005's arguments that consent was required for Greyhound to assign its interests under the Escrow Agreement or that Greyhound retains secondary liability under the Escrow Agreement despite its assignment to FGS. *See supra* notes 5, 7. All the Court has determined is that Greyhound's assignment gave FGS a tangible stake in the suit such that its participation as a defendant is warranted.

[9] Of course, FGS's addition to this suit could also properly be accomplished via another means. For example, nothing the Court has said in this Opinion and Order should be

## CONCLUSION

Altogether, as explained, Greyhound's assignment did not conclusively absolve it of liability for at least one claim in the Complaint, which means it may not, at this time, under either Rule 17 or Rule 25(c), head for the door. The Court therefore **DENIES** Greyhound's Motion to Substitute. (Doc. 19).

But as discussed, FGS appears to be left holding (at least part of) the bag for Greyhound under the Escrow Agreement. So FGS should be permitted to participate in this suit if it wishes. Seeing as FGS has not moved or entered an appearance in this suit, though, the Court currently lacks the power to direct its actions. That said, the Court would entertain a motion to intervene or for joinder if FGS so moves (or, CP-1005, if it so desires, could seek to amend its Complaint to add FGS as a defendant). Thus, the Court **DIRECTS** Greyhound's counsel (who notified the Court of counsel's concurrent representation of FGS) to notify FGS of this Court's decision and to have FGS file any such motion to join this suit, if it wishes to file such a motion, **within 30 days** of the entry of this Opinion and Order.

SO ORDERED.

March 6, 2024
**DATE**

**DOUGLAS R. COLE**
**UNITED STATES DISTRICT JUDGE**

---

understood to suggest that CP-1005 is foreclosed from amending its Complaint to plead any and all claims it believes it has against FGS.

15